**David PODLOG, Plaintiff,**

v.

**UNITED STATES of America, Defendant.**

**CIVIL NO. CV–98–1440.**

United States District Court, M.D. Pennsylvania.

Feb. 1, 2002.

David Podlog, Ft. Dix, NJ, Rada Tarnovsky, New York, NY, Jack V. Corradino, Corradino Law Offices, Clifton, NJ, John Klotz, Totowa, NJ, for David Podlog.

Joseph J. Terz, U.S. Attorney's Office, Harrisburg, PA, Dulce Donovan, U.S. Attorney's Office, Harrisburg, PA, for U.S., U.S. Attorney General.

Dulce Donovan, U.S. Attorney's Office, Harrisburg, PA, for Federal Bureau of Prisons.

### MEMORANDUM and ORDER

NEALON, District Judge.

The plaintiff filed the instant complaint pursuant to the Federal Torts Claim Act (FTCA), 28 U.S.C. § 2671 *et seq.*, on August 31, 1998, while incarcerated at Federal Correctional Institutions including the United States Penitentiary, Lewisburg, Pennsylvania (USP–Lewisburg).[1] In his complaint, plaintiff seeks to recover damages against the defendant for failure to render timely, adequate and proper medical treatment. (Doc. 1, p. 5.) Specifically, he alleges that the negligence of the medi-

---

1. David Podlog is presently an inmate at the Federal Correctional Institution, Cumberland, Maryland (FCI–Cumberland).

cal personnel at USP–Lewisburg led to the worsening of his heart condition that resulted in coronary bypass surgery on June 26, 1997. (*Id.*, p. 7–8).

The parties submitted pretrial memoranda on July 19, 2001 and July 23, 2001 respectively, (Docs.83, 86), followed by statements of proposed facts on July 19, 2001 and July 20, 2001, respectively. (Docs.84, 87). Trial was held before the undersigned on July 24, 2001, July 25, 2001 and July 26, 2001. During the course of trial, the court heard live testimony from the following witnesses: David Podlog, Dr. Budd Heyman, and Dr. Michael Barrett. Subsequently, the parties submitted separate findings of fact and conclusions of law, as well as responses thereto. (Docs.102, 105, 107). For the reasons which follow, the court will enter judgment for the defendant.

### FINDINGS OF FACT

### I.  Background Facts

1.  Plaintiff, David Podlog, was born on March 3, 1947.

2.  Podlog is presently fifty-four (54) years old.

3.  Podlog was born and resided in the Ukraine prior to emigrating to the United States in 1978.

4.  From 1978 to 1991, Podlog resided in New York, Florida, California and Rhode Island.

5.  In April or May of 1991, Podlog moved to New York. In April, 1992, Podlog was arrested.

6.  On April 27, 1993, Podlog was convicted in the Southern District of New York of narcotics conspiracy in violation of 21 U.S.C. § 846.

7.  On October 5, 1994, Podlog was sentenced to serve a prison term of twenty-seven (27) years with a five (5) year term of supervision to follow.

8.  Podlog's projected release date is August 25, 2016.

9.  At the time of his scheduled release from prison, Podlog will be sixty-nine (69) years old.

10.  On November 21, 1994, the Immigration and Naturalization Service ("INS") lodged a detainer against Podlog.

### II.  History of Incarceration

### A.  Metropolitan Correctional Center ("MCC"), New York, New York

11.  After his initial arrest in April, 1992, and brief detention in the MCC New York, Podlog was released on bail.

12.  On February 11, 1993, following his conviction, Podlog was remanded to MCC New York.

13.  Until his designation to USP–Lewisburg on October 27, 1994, Podlog transferred among MCC New York, the Federal Correctional Institution ("FCI") Otisville, New York and the Westchester County Jail in Valhalla, New York.

14.  On April 5, 1994, while confined to the Westchester County Jail, Podlog reported to the Emergency Department of the Westchester County Medical Center in Valhalla, New York complaining of chest pain.

15.  Later that same day, Podlog signed himself out of the hospital against medical advice.

16.  On April 6, 1994, at approximately 1:45 a.m., Podlog was readmitted to the Westchester County Medical Center with complaints of chest pain.

17. While at Westchester, doctors prescribed Heparin, aspirin and Sorbitrol to Podlog.

18. Electrocardiograms (EKGs) taken on April 6, 1994, indicated normal sinus rhythm.

19. A myocardial infarction, or heart attack, was ruled out.

20. Podlog's cholesterol level was 264.

21. A noninvasive stress test completed on April 8, 1994, was negative, with Podlog exercising for nine (9) minutes with no symptoms of chest pain or shortness of breath.

22. Podlog refused to take a sestimibi (radioactive material) stress test.

23. On April 9, 1994, Podlog was discharged from the Medical Center.

24. Podlog's discharge medication consisted of aspirin 325 mg to be taken every day.

25. Podlog was instructed to adhere to a low sodium, low cholesterol diet.

26. On May 18, 1994, upon Podlog's return to MCC New York from FCI–Otisville, during a routine intake screening, he reported to the Physician's Assistant ("PA") that in the prior two (2) months he had experienced shortness of breath, pain and pressure in his chest, palpitations and a pounding heart. Podlog indicated to the PA that he had been in Westchester County Hospital for chest pain.

27. The PA who conducted Podlog's intake screening noted that there were no medications prescribed for Podlog at that time.

28. On May 20, 1994, Podlog was called to the MCC New York Health Services Unit due to his prior representation during his initial screening of recent chest pain.

29. Podlog reported that six (6) weeks ago he had developed an episode of chest pain and was hospitalized at Westchester County Medical Center. Podlog stated that a stress test previously performed was negative. Podlog also reported that he was discharged on no medication and that he had been asymptomatic for chest pain ever since. The attending physician concluded that no treatment was indicated at that time.

30. On July 18, 1994, Podlog reported to the MCC New York Health Services Unit complaining that he still had discomfort in his chest. The attending physician noted that Podlog had previously tested positive for PPD (purified protein derivative).[2] Referencing the chronological note of May 20, 1994, the attending physician noted that Podlog had reportedly had a negative stress test and that his discomfort was thought to be musculoskeletal in nature.

31. On September 1, 1994, Podlog reported to the MCC New York Health Services Unit complaining of chest pain. He was diagnosed with indigestion.

B. *United States Penitentiary–Lewisburg*

*Arrival at USP–Lewisburg*

32. Podlog arrived at USP–Lewisburg on October 27, 1994.

33. Upon his arrival at USP–Lewisburg, Podlog completed a medical history questionnaire.

---

**2.** "PPD" is an abbreviation for purified protein derivative—a test for tuberculosis.

34. Podlog did not indicate that he had been treated for chest pain at Westchester County Medical Center or that he had suffered from heart trouble, shortness of breath, or chest pain.

*October 31, 1994*

35. On October 31, 1994, based on his positive PPD test, routine chest x-rays were ordered by Dr. Daniel Romero. Podlog was examined on November 15, 1994, and his chest x-ray was normal.

*December 5, 1994*

36. On December 5, 1994, Podlog reported to Health Services complaining solely of a lump in his pubic region which he had for seven (7) years.

37. Dr. Velasco examined Podlog. His examination revealed that there was a mass at Podlog's pubic region on the left side which was nonmovable and tender under palpitation.

38. Dr. Velasco ordered a general surgery consult to determine if Podlog had an inguinal hernia.

*January 5, 1995*

39. On January 5, 1995, Podlog reported to Health Services and saw Dr. Romero. Podlog complained of pain in his epigastric region, occasionally upon movement of his body and on walking.

40. Podlog also reported that he had light belching, but did not believe that the pain was related to any food intake.

41. Podlog reported that he had been experiencing this for eight (8) to nine (9) months.

42. Podlog stated that he had no pain when he was lying down.

43. Dr. Romero diagnosed Podlog's symptoms as possible hyperacidity.

44. Podlog was advised to stop smoking, refrain from drinking coffee and acidic juices and instructed not to use hot seasonings.

45. Dr. Romero prescribed the antacid medication Gaviscon.

*October 6, 1995*

46. Podlog's next visit to the Health Services Unit was on October 6, 1995. At that time, Podlog complained solely of a left eye itch and pain to PA Patrick Gsayande.

47. PA Gsayande's examination revealed that Podlog was not in acute distress.

48. Podlog's left eye area was reddish.

49. PA Gsayande ruled out conjunctivitis and allergies.

50. Podlog was prescribed sulfacetamide sodium opthalmology 10% solution to be applied to the affected area.

51. Podlog was instructed to apply one (1) to two (2) drops to the affected eye twice daily in the morning and evening.

52. In addition, the side effects were explained to Podlog and he was told to return to sick call if the condition of his left eye became worse.

*November 4, 1995*

53. On November 4, 1995, Podlog presented at the Health Services Unit with complaints of passing out while he was shaving in his cell.

54. Podlog complained of chest pain and fatigue.

55. Podlog did report that he smoked two and one-half (2½) packs of cigarettes per day.

56. PA Gsayande examined Podlog and determined that he was in no acute distress.

57. Podlog's vital signs were: blood pressure, 129/74; pulse, 76; respiration, 16; and temperature, 97.7.

58. PA Gsayande ruled out heartburn and dizziness.

59. A twelve (12) lead EKG was completed with normal results.

60. PA Gsayande told Podlog to stop smoking.

61. On this same date, November 4, 1995, Podlog reported to Dr. Leon Biglete that he had a normal stress test in 1994.

62. When Dr. Biglete saw him, Podlog stated that he was feeling better. Dr. Biglete noted Podlog's complaint as vertigo.

63. Dr. Biglete noted that there was no neurological deficit, and that Podlog had suffered a simple fainting spell.

64. Dr. Biglete recommended no treatment at that time.

*February 26, 1996*

65. Podlog's next visit to the Health Services Unit was on February 26, 1996. On that date, Podlog reported that he had experienced dizziness and nausea a few minutes prior to his consultation with PA Salvador Villalon.

66. The examination revealed that Podlog was in no acute distress and that he was ambulatory.

67. Podlog's vital signs were: blood pressure, 140/70, which reduced to 120/70 after fifteen minutes; pulse, 90; temperature, 97.4.

68. In addition, PA Villalon noted Podlog's oxygen saturation as 93% and blood sugar as 112 milligrams per deciliter

69. A neurological exam was negative.

70. Podlog's lungs were clear and his heart rate was normal with regular rhythm.

71. An EKG performed showed an incomplete right bundle branch block, otherwise normal.

72. Podlog's carotid artery and abdomen were clear.

73. PA Villalon assessed Podlog as experiencing vertigo.

74. PA Villalon prescribed Podlog Antivert for his nausea, one 12.5 mg tablet to be taken three times a day for three days.

75. PA Villalon told Podlog to return to the clinic as necessary.

76. PA Villalon also ordered a complete blood and differential count.

*February 27, 1996*

77. On February 27, 1996, Podlog was called to the Health Services Unit due to an abnormal white blood cell count.

78. Podlog offered no complaints.

79. Podlog was diagnosed with folliculitis and prescribed antibiotics.

80. Podlog does not contend that the medical treatment rendered to him on February 27, 1996 was negligent.

*March 14, 1996*

81. On March 14, 1996, Podlog went to the Health Services Unit asking for the results of his blood test.

82. Podlog offered no complaints.

83. Podlog was advised to return during the regular sick call when the labo-

ratory technician was available and he could be followed-up by the medical officer.

84. Later that same day, PA Villalon noted that Podlog had returned to Health Services but that the laboratory technician was not there.

85. Podlog was advised to return to the clinic the next day.

86. Podlog does not contend that the medical treatment rendered to him on March 14, 1996 was negligent.

*March 15, 1996*

87. On March 15, 1996, Dr. Biglete noted that Podlog's laboratory report showed that he tested positive for Hepatitis B.

88. Dr. Biglete requested that Podlog be placed on the call out list to come to Health Services.

*March 18, 1996*

89. On March 18, 1996, Dr. Biglete saw Podlog and informed him that he had tested positive for Hepatitis B, and "weakly" for Hepatitis C.

90. Podlog offered no complaints.

91. Dr. Biglete educated Podlog on Hepatitis A, B and C, and ordered a repeat hepatitis profile and urine analysis in two (2) months.

*June 13, 1996*

92. On June 13, 1996, Podlog reported to Health Services complaining of feeling tired for the past three (3) to four (4) weeks and complained of chest pain.

93. In addition, Podlog reported that he was experiencing heartburn, and wanted to know the results of the hepatitis test.

94. Podlog offered no further complaints.

95. Dr. Romero noted that Podlog's chest was clear, he had a regular sinus rhythm with no murmur and the abdominal examination was negative.

96. Dr. Romero noted that Podlog was diagnosed with Hepatitis B.

97. Dr. Romero told Podlog to refrain from drinking coffee and acidic juices and instructed him not to use hot seasonings.

98. Dr. Romero continued the order for two (2) chewable Gaviscon tablets to be taken two (2) hours after meals.

99. Podlog was advised to return to the clinic as needed.

100. Podlog did not comply with Dr. Romero's instructions that he avoid spices, hot seasonings and coffee.

*September 11, 1996*

101. On September 11, 1996, Dr. Romero entered an administrative note that due to Podlog's positive blood test results for hepatitis he would be restricted from working in the following areas: food service, dental, barber shop and the hospital.

*November 19, 1996*

102. On November 19, 1996, Podlog reported to Health Services to request a refill of his antacid and antifungal cream. He offered no complaints.

103. PA Vicarthus Factora noted that Podlog had a history of peptic ulcer diseases.

104. Upon examination, PA Factora noted that Podlog was coherent and ambulatory. In addition, Podlog appeared to have dry, cracked skin lesions on both feet.

105. PA Factora ordered Maalox, two teaspoons by mouth three times per

day; prescribed 325 mg tablets of aspirin, two tablets by mouth every four to six hours for headaches; and antifungal cream to apply to involved ·areas, two times a day for seven days.

106. PA Factora advised Podlog to return to the clinic if necessary.

107. Podlog does not contend that the medical treatment rendered to him on November 19, 1996 was negligent.

*November 27, 1996*

108. On November 27, 1996, Podlog was seen in Health Services by PA Factora solely to request hydrogen peroxide mouthwash.

109. On this date, Podlog was coherent, ambulatory, and in no acute distress.

110. PA Factora educated Podlog on the use and effects of the hydrogen peroxide.

111. Podlog does not contend that the medical treatment rendered to him on November 27, 1996 was negligent.

*January 3, 1997*

112. On January 3, 1997, Podlog was seen in Health Services with complaints that he had been suffering from dizziness for fourteen (14) months and stated that "he felt it [was] coming from his heart."

113. Podlog informed Dr. Romero that he had no history of high blood pressure.

114. Podlog reported that the only medication he was taking was coated aspirin, a multivitamin and Tylenol.

115. Podlog complained of chest pain and shortness of breath.

116. Podlog reported no nausea, vomiting or blurred vision.

117. Podlog stated that his "dizziness" lasted from ten (10) to twenty (20) minutes, and that he did not pass out.

118. Podlog was not experiencing any dizziness at the time of the exam.

119. The examination revealed that Podlog was in no acute distress, that his chest was clear and that his heartbeat was regular.

120. A check of Podlog's abdomen indicated no bruit (sporadic sounds of blood flow) and no hepatosplenomegaly (an enlargement of the liver or spleen).

121. A neurological exam conducted was within normal limits.

122. Dr. Romero questioned the etiology of the dizziness and ordered a Chemistry–24 profile and a test for H–Pylori.

123. Podlog was informed that he would be advised of the test results.

124. Podlog was told to stop smoking.

125. In addition, Podlog was given a bottle of Maalox to use as directed for stomach acid.

126. Finally, Podlog was given a bottle of hydrogen peroxide to mix with water for use as a mouthwash.

127. Podlog's Chemistry–24 profile was drawn on January 8, 1997.

128. The test results were positive for H–Pylori.

129. Podlog's cholesterol level tested at 262.

*February 13, 1997*

130. On February 13, 1997, Podlog went to Health Services to follow up on the lab work. The lab work indicated that Podlog tested positive for H–

Pylori. He was prescribed several medications for ulcer related complaints.

131. Podlog was also prescribed Fluvastatin for his high cholesterol and instructed to maintain a low cholesterol diet.

132. Podlog offered no further complaints that day.

*March 17, 1997*

133. On March 17, 1997, Podlog reported to Health Services complaining solely of inguinal itching for the past week.

134. Dr. Romero's examination revealed erythematous (area of redness to the skin) rash to both inguinal areas with signs of excoriation (abrasion) due to scratching.

135. Dr. Romero prescribed Mycelex cream to apply to the affected area two (2) times a day.

136. Podlog was instructed on how to apply the cream, the side effects of his medication and to avoid contact with his eyes.

137. Podlog was advised to return to the clinic if the problem persisted.

C. *Federal Correctional Institution, Cumberland, Maryland, and Federal Medical Center, Springfield, Missouri.*

138. Podlog was transferred from USP–Lewisburg to FCI–Cumberland, Maryland, on March 24, 1997.

139. On April 9, 1997, Podlog was not compliant in taking his H–Pylori medication.

140. On May 1, 1997, Podlog complained to the FCI–Cumberland medical staff that he experienced chest pain while walking in the recreation yard.

141. Nitroglycerin was prescribed and Podlog was scheduled for a follow-up appointment.

142. On May 2, 1997, Podlog returned to Health Services for his follow-up appointment.

143. Podlog reported that he had pain radiating in his left chest and left arm after five (5) to ten (10) feet of walking.

144. A stress test and echocardiogram were ordered.

145. On May 19, 1997, Podlog underwent a stress test and an echocardiogram.

146. Podlog's stress test was positive for ischemia.

147. Podlog's echocardiogram results indicated borderline dilation of the left atrium and normal overall ventricular systolic function.

148. On May 28, 1997, Podlog reported to the sick call complaining of chest pain mostly at night and indicated that the pain was relieved by nitroglycerin.

149. Dr. Bartok noted that Podlog's angina was under study, continued his nitroglycerin prescription and added him to the cardiac clinic.

150. Podlog was seen in the Health Services Unit on June 2, 1997, for an interpretation of his cardiology work-up. Podlog had no complaints of chest pain at that time.

151. On June 9, 1997, Podlog reported to sick call and noted that his condition had gradually worsened over the last two (2) weeks and that he was no longer able to walk more than three (3) minutes without chest pain.

152. Dr. Bartok prescribed Lopressor and instructed Podlog about a healthy diet and lifestyle.

153. In light of his positive stress test, Podlog underwent a cardiac catheterization on June 17, 1997, at Sacred Heart Hospital in Cumberland, Maryland.

154. The cardiac catheterization indicated three (3) vessel occlusive coronary artery disease.

155. Podlog was admitted to Sacred Heart Hospital in Cumberland, Maryland following his catheterization and started on a Heparin drip.

156. On June 18, 1997, Podlog was flown to the United States Medical Center in Springfield, Missouri.

157. On June 26, 1997, at the St. John's Regional Health Center, Springfield, Missouri, Podlog underwent a successful coronary artery bypass grafting times five (5) with saphenous vein graft.

158. Podlog's surgical recovery was unremarkable. He was discharged on July 2, 1997, to the United States Medical Center with the following prescriptions: ascripton, one (1) tablet by mouth every day; pepcid, 20 mg tablet by mouth two (2) times a day; medrol pack; cardizam, 60 mg tablet by mouth four (4) times a day; darvocet-N, 100 tablet four (4) hours as needed; restoril, 50 mg tablet by mouth every night before bedtime.

159. Upon his return to the United States Medical Center, Podlog was noncompliant and would not take the medication prescribed for him.

160. At the time of his transfer back to FCI–Cumberland, on September 2, 1997, Podlog's final diagnosis was:

(1) status coronary artery disease; (2) history of severe coronary artery disease; (3) slightly slow healing of right leg venous graft harvest site; and (4) mild peripheral vascular disease.

161. It was recommended that Podlog gradually increase his activity and that within three (3) months he could progress to normal activity.

162. Podlog was also advised to reduce his weight with a low-fat diet.

163. Podlog was recommended for light duty work until he was able to resume normal activity.

### LEGAL STANDARD

The FTCA allows federal prisoners to pursue suits against the United States in an effort to recover for personal injuries sustained during confinement by reason of negligence of government employees. *United States v. Muniz*, 374 U.S. 150, 83 S.Ct. 1850, 10 L.Ed.2d 805 (1963); 28 U.S.C. § 1346(b). The primary purpose of the FTCA is to "remove sovereign immunity of the United States from suits in tort, and with certain specific exceptions, to render the Government liable in tort as a private individual would be under like circumstances." *Richards v. United States*, 369 U.S. 1, 6, 82 S.Ct. 585, 7 L.Ed.2d 492 (1962); 28 U.S.C. § 1346(b). Under the FTCA, "the law of the place where the alleged act or omission occurred is to be applied." *Turner v. Miller*, 679 F.Supp. 441, 443 (M.D.Pa.1987); 28 U.S.C. § 1346(b). Because most of the conduct giving rise to the petitioner's claim occurred at USP–Lewisburg, Pennsylvania state law will apply.[3]

**3.** Although most of the conduct giving rise to the plaintiff's complaint occurred in Pennsylvania, some of the conduct also took place in New York and Maryland. As there is no assertion otherwise, the same legal standards will be employed as to plaintiff's treatment at Westchester, MCC New York and Cumberland. However, Dr. Heyman's testimony was concentrated on the treatment plaintiff received at Lewisburg. He stated that the

The United States Bureau of Prisons has a duty to provide adequate medical care to a prisoner. *Yosuf v. United States*, 642 F.Supp. 415, 427 (M.D.Pa. 1986). In order to succeed on the present claim, plaintiff must show by competent medical evidence that the conduct of the medical personnel treating him fell below the standards of reasonable medical practice under the circumstances and proximately caused his injuries. *Lira v. Albert Einstein Medical Center*, 384 Pa.Super. 503, 559 A.2d 550, 552 (1989). Physicians and medical staff are liable for failure to exercise ordinary skill, care and diligence which results in injury to the patient. *Incollingo v. Ewing*, 444 Pa. 263, 299, 282 A.2d 206, 217 (1971). Furthermore, "the plaintiff generally must present an expert who will testify, to a reasonable degree of medical certainty, that the acts of the defendants deviated from the acceptable medical standards, and that the deviation constituted a substantial factor in causing the plaintiff's injury." *McCabe v. Prison Health Services*, 1997 WL 710943, * 12 (E.D.Pa.) (citing *Mitzelfelt*, 584 A.2d at 892).

## ANALYSIS

There are relatively few disputes concerning the facts. The issue is whether the care rendered to plaintiff fell below acceptable standards for medical treatment by physicians and medical staff. Plaintiff's expert, Dr. Budd Heyman, testified that the treatment did not conform to acceptable standards while the defendant's expert, Dr. Michael Barrett, opined that the treatment did so conform. Consequently, the testimony of these experts will have to be examined to determine which

opinion is more persuasive as to whether the Government's medical staff provided reasonable and acceptable medical treatment to plaintiff.

A brief chronology of the dates of treatment and the differing medical views is necessary.

*April 5–9, 1994*

On April 5, 1994, while an inmate at the Westchester County Jail, plaintiff complained of chest pain and was taken to the Westchester County Medical Center.

At Westchester, plaintiff was given a cholesterol screening, a standard stress test, and an EKG. His cholesterol reading was 264. The stress test and EKG were normal and a heart attack was ruled out. Plaintiff refused to take a sestimibi stress test which would involve the injection of an intravenous radioactive material to determine the source of his chest pain. He was discharged with a finding that was negative for ischemia and with a diagnosis of atypical chest pain.

*May 20, 1994*

During a routine intake screening, Podlog told the PA that he had been taken to Westchester County Medical Center six (6) weeks previously because of complaints of chest pain, shortness of breath and a pounding heart. He advised that a stress test was negative and that he was not prescribed any medication. Since then he has had no chest pain.

Dr. Heyman believed that more of a workup, including a lipid profile, should have been done when plaintiff was returned to MCC New York.

April, 1994, referral to Westchester Hospital was "appropriate" and initially said that at Cumberland "they did what they had to do," but when plaintiff's counsel commented that

"they didn't do anything", Dr. Heyman responded "[y]eah, then Cumberland is a problem, also." (Doc. 95, p. 182).

Dr. Barrett disagreed and noted that plaintiff had been asymptomatic since his examination at Westchester.

*July 18, 1994*

Podlog went to the MCC New York Health Unit and complained of discomfort in his chest. The treating physician noted that plaintiff had a negative stress test on May 20, 1994, and concluded that the cause was musculoskeletal.

Dr. Heyman stated that there should have been more testing, including a lipid cholesterol profile. He acknowledged, however, that plaintiff had a normal stress test "and probably does not have severe disease but there might be something brewing." (Doc.95, p. 124). He concluded that the chest pain was not adequately addressed and that this treatment fell below acceptable medical standards.

Dr. Barrett testified that the treating physician, Dr. Mark Glover, was obviously aware of the May 18, 1994, negative work-up for ischemia and properly concluded that the chest pain was not due to ischemia. He said no further testing was required under the standard of care.

*September 1, 1994*

Plaintiff reports at MCC New York that he had chest pain in the center of the sternum.

Dr. Heyman believed there was inadequate documenting and that plaintiff's pain could have been a symptom of a lot of things including ulcers or heart disease.

Dr. Barrett noted that an examination of the heart and vital signs was performed and it was normal. The attending physician also made reference to the negative stress test. Based on the objective normal findings, Dr. Barrett found that an assessment of indigestion was proper.

*January 4, 1995 (At Lewisburg—Plaintiff arrived October 27, 1994)*

Plaintiff went to the Health Unit and complained of epigastric pain and belching. His condition was diagnosed by Dr. Romero as hyperacidity and he was given the antacid Gaviscon.

Dr. Heyman believed that plaintiff presented with high risk factors and more information should have been obtained.

Dr. Barrett stated that there was no need to get the medical records from Westchester but only from the last facility which was MCC New York. Moreover, the records from MCC New York indicated that the discharge report from Westchester stated that plaintiff's complaint was noncardiac in nature and no medication was prescribed. According to Dr. Barrett, the information concerning the care at Westchester could have been acquired from the patient and no further inquiry was necessary.

*November 4, 1995*

Podlog reported to the Health Services Unit complaining of chest pain and fatigue and reported that he passed out while shaving in his cell. He was in no acute distress. An EKG was performed and it was normal. Vital signs were normal. Plaintiff told Dr. Biglete that he had a normal stress test in 1994. The doctor noted vertigo, found no neurological deficit and concluded that plaintiff had a simple fainting spell.

Dr. Heyman testified that the patient could have had a very serious condition even though the EKG was normal. He stated that cardiovascular disease accounts for 30% of all syncopal episodes. He opined that with plaintiff's high risk history, he should have been sent to a hospital.

Dr. Barrett noted that an EKG was administered and it was normal. The entry note stated that the 1994 stress test

was normal; that plaintiff was on no medication; that he now feels better; that there was no neurological deficit; and that the complaint concerned dizziness. The attending physician, Dr. Biglete, after interviewing the plaintiff, concluded that the actual complaint was dizziness, and that there was no passing out or a complete loss of consciousness. Dr. Barrett posited that the symptoms were properly interpreted as a simple fainting spell and not syncope. There was no evidence that plaintiff suffered from an abnormal heart rhythm and his blood pressure and pulse rate were normal. Dr. Barrett stated that the records and treatment sufficiently met the standard of care and that there was no need to send plaintiff to a hospital.

*February 26, 1996*

Plaintiff reported to the Health Services Unit complaining of dizziness and nausea although he was not in acute distress when examined. His blood pressure was 140/70 which reduced to 120/70 after fifteen (15) minutes. An EKG was normal except for an incomplete right bundle branch block. A neurological exam was negative; his lungs, carotid artery, and abdomen were clear. A complete blood test was ordered and when the test was later completed, it tested positive for Hepatitis B. PA Villalon diagnosed plaintiff's condition as vertigo and prescribed Antivert.

Dr. Heyman testified that further tests should have been performed at the unit, such as a motor exam, and the patient should have been observed while walking and then referred to a hospital to be seen by an internist for cardiac treatment.

Dr. Barrett claimed that dizziness can be associated with nausea. It was his belief that the facts contained in the record, and the tests performed, supported a diagnosis of vertigo and the medication prescribed was well within the standard of medical care.

*June 13, 1996*

Plaintiff reported to the Health Services Unit complaining of feeling tired for three (3) to four (4) weeks and that he had heartburn and chest pain. Dr. Romero noted that plaintiff's chest was clear; that he had a regular sinus rhythm with no murmur; and that the abdominal examination was negative. He prescribed antacid tablets and advised plaintiff to return to the clinic when needed.

Dr. Heyman testified that heartburn could suggest coronary disease and that a more thorough workup should have been done including a blood test and a stool check.

Dr. Barrett maintained that heartburn and tiredness for three (3) to four (4) weeks are not suggestive of heart disease but are indicators of an overacid problem. Additionally, while the patient's negative stress test occurred two (2) years ago, it is still an important fact to be considered in the medical care. He concluded that there were no symptoms suggesting coronary artery disease and the treatment was proper.

*January 3, 1997*

Plaintiff was seen in the Health Services Unit and complained that he had been suffering from dizziness for fourteen (14) months and that he felt it was coming from his heart. His dizziness lasted from ten (10) to twenty (20) minutes. He stated that he had chest pain and shortness of breath. A neurological exam was normal, his chest was clear, his heartbeat was regular, and it was noted that plaintiff was not in acute distress. Dr. Romero ordered a Chemistry–24 profile as well as a test for H–Pylori and told plaintiff to stop smoking. Plaintiff was given Maalox for stomach acid.

Dr. Heyman stated that a GI series should also have been ordered to find if an ulcer was present and a complete blood count should have been performed to determine if plaintiff was a candidate for immediate hospital referral.

Dr. Barrett disagreed and said that the neurological exam was normal which showed that there was no seizure disorder. Plaintiff was not experiencing dizziness at the time and his chest was clear and heartbeat normal. Some tests were ordered. There was no need for any additional testing for an ulcer.

*February 13, 1997*

Plaintiff went to the Health Services Unit and was advised that he tested positive for H–Pylori and prescribed ulcer medication. He was also prescribed Fluvastatin, a statin drug, in an effort to reduce his high cholesterol.

Dr. Heyman testified that it was not an accepted medical practice to prescribe antibiotics for treatment of an ulcer without documenting the existence of an ulcer by an endoscopy or upper GI series. He agreed that is was proper to prescribe a statin drug but that it should have been prescribed in 1995 at the latest and failure to do so was contrary to medically accepted standards.

Dr. Barrett had a contrary opinion and stated that indigestion is probably the most common cause for people to seek medication from a physician. He stated that only if the symptoms continued, or if there was gastrointestinal bleeding, should an endoscopy be performed and the presence of the bacteria H–Pylori shows that plaintiff was at risk for a stomach ulcer and an antibiotic was the proper medication to eradicate the bacteria.

He testified further that a statin drug can cause liver disease and myositis, which is an inflammatory condition in the muscles, and that many physicians have not yet decided whether the benefit of this drug is worth the risk to the patient. He believed weight reduction, exercise and lifestyle changes should be addressed first before a statin drug is prescribed. It was his opinion that, even in the year 2001, failure to prescribe statin drugs as primary prevention for a patient with a cholesterol reading of 262 would satisfy the acceptable standard of care. Reports from pharmacology databases indicate that only about one-third of patients with primary prevention indications in 2001 are, in fact, on the medication. He stated again that two-thirds of the physicians even today have not decided that the risk is worth the benefit. Primary prevention applies to patients who have high risk factors for coronary disease while secondary prevention exists where the patient has documented heart disease. Additionally, the statin drugs would not decrease plaintiff's need for bypass surgery. Finally, he argued that it would not be until 1999, four (4) years after the statin study was released, before its results could be considered statistically reliable.

*May, 1997 (Federal Correctional Institution, Cumberland, Maryland)*

A series of events involving plaintiff's care occurred from May 1 to May 28, 1997, after plaintiff was transferred to FCI–Cumberland on March 24, 1997. On May 1st, he complained to the medical staff that he experienced chest pain radiating in his left arm while walking in the recreation yard. He was prescribed nitroglycerin and scheduled for a stress test and echocardiogram, which were performed on May 19, 1997. The stress test was positive for ischemia and the echocardiogram results indicated borderline dilation of the left atrium and normal overall ventricular systolic function. On May 28, 1997, he complained again of chest pain at night al-

though reporting that the pain was relieved by nitroglycerin. His nitroglycerin regimen was continued and he was added to the cardiac clinic.

Dr. Heyman testified that chest pain radiating to the left arm which plaintiff reported on May 1st is classic angina symptomatology and, because it was a new onset of chest pain, immediate hospitalization was required. Moreover, there was inadequate documentation that fell below acceptable medical standards. Inasmuch as the pain continued into May 2nd, the doctor said it indicated unstable angina and referral to a hospital instead of a stress test and echocardiogram was necessary. He stated that by May 28th in addition to hospitalization, a cardiologist should have been consulted especially since plaintiff was experiencing chest pain at night when the body is at rest.

Dr. Barrett testified to the contrary and asserted that from May 1, 1997, until his bypass surgery, plaintiff received the appropriate tests and, when the results were ultimately found to be positive, he was referred for cardiac catheterization. Moreover, the bypass procedure was elective and not an emergency. He claimed that Dr. Heyman's comments reflected optimum or maximum care and not the average standard of care. He stated further that the pain should last thirty (30) minutes before hospitalization would be appropriate and that plaintiff's pain was only five (5) to fifteen (15) minutes in duration. He was satisfied that the treatment with nitroglycerin was proper.

*June 9–18, 1997*

On June 9, 1997, plaintiff informed Dr. Bartok that his condition had worsened over the past two (2) weeks and that he could no longer walk for more than three (3) minutes without incurring chest pain. Dr. Bartok prescribed Lopressor and arrangements were made to transfer plaintiff to Sacred Heart Hospital in Cumberland, Maryland for a cardiac catheterization. Plaintiff was admitted to the hospital on June 17, 1997 and started on a Heparin drip after the catheterization revealed three (3) vessel occlusive coronary artery disease. On June 18th, plaintiff was flown to the United States Medical Center in Springfield, Missouri, and, on June 26th, he underwent successful coronary artery bypass surgery.

Dr. Heyman stated again that plaintiff should have been hospitalized before June. He noted that prescribing Lopressor was "a good drug to start" but that additional testing and documentation should have been done and that failure to do so did not meet acceptable medical standards.

As he stated previously, Dr. Barrett testified that plaintiff received the proper treatment under acceptable medical standards from May 1st up to the time of the bypass surgery. Furthermore, the bypass surgery did not prolong plaintiff's life expectancy but merely eliminated his pain and plaintiff did not sustain any heart damage.

## DISCUSSION

Both physicians were well qualified as expert witnesses. Dr. Heyman is a Board Certified Internist while Dr. Barrett is not only board certified as an Internist but also as a Cardiologist. The importance of an expert in cardiology was borne out even by the testimony of Dr. Heyman who repeatedly testified of the need for the prison physicians to refer plaintiff for further study either to a hospital or to a cardiologist. Dr. Barrett's standing and experience in the field of cardiology is demonstrated by the positions he has held, such as a clinical associate professor in medicine at Hahnemann University Medical School as well as teaching positions in cardiology

at several other institutions. He has also authored approximately thirty-thrèe (33) articles in cardiology. This is not to minimize Dr. Heyman's background as he did serve in prison health service for 4½ years at the Manhattan House of Detention as well as brief service at prisons in New Mexico and Massachusetts. However, the testimony revealed that Dr. Barrett had read and familiarized himself with more treatment records and the contents of depositions than Dr. Heyman, who was furnished with fewer records to review. Dr. Barrett appeared more informed on the details and results of the West of Scotland Coronary Prevention Group Study (WO-SCOPS) concerning the potential use of statin drugs as primary and secondary treatment of patients with high cholesterol readings.

I believed that Dr. Heyman's version of the standard of medical care was exceedingly high. In fact, he described his view concerning recordkeeping to be "almost fanatical." (Doc. 95, p. 101). His opinion as to the appropriate medical response to a patient's complaints, some of which were quite common complaints, appeared to be praiseworthy but somewhat beyond what was necessary. I thought this was summed up by Dr. Barrett when he stated that Dr. Heyman's opinions mirrored optimum or maximum medical care rather than standard care. Examples of these higher standards were revealed in his answers to my questions when he had said that the standards of medical care in cases where a patient revealed that he had a single episode of passing out, or a fainting spell a week previously, would require immediate hospitalization. This extraordinary effort to serve a patient after a fainting spell actually caused me to remark, "I'd like you to be my doctor, to be honest with you." (Doc. 95, p. 121).

Dr. Barrett's opinions were based on the objective findings and test results which were normal and he believed were sufficient without the need for additional testing or hospitalization. He pointed out that most of plaintiff's subjective complaints were not verified by the physical and neurological examinations or by the stress tests or EKGs. Again, it is admirable that Dr. Heyman felt that a treating physician should "not take any chances" or should "err on the side of caution" and seek additional testing but failure to do so, without more, would not fall below the acceptable standard of medical care. Dr. Barrett carefully reviewed all the pertinent files and records and concluded that the documentation and treatment were well within the standard of medical care. Moreover, his explanations as to the appropriate use of statin drugs, with the potential for serious side effects, was persuasive. He was of the belief that even in the year 2001, two-thirds of the physicians were not satisfied that the risk in prescribing the statin drug was worth the potential benefit.

Furthermore, Dr. Barrett was of the opinion that plaintiff did not have a life-threatening cardiac disease because there was no blockage in the left main artery and, while there was significant blockage in three (3) arteries, *viz*, the left anterior descending artery, the right coronary artery and the left circumflex artery, plaintiff retained a normal ejection fraction of 55%. Although Dr. Heyman stated that, whether these blockages constituted serious cardiac disease depended upon the ejection fraction, he did not testify that plaintiff did not have a normal ejection fraction. It is regrettable that Podlog had to undergo bypass surgery but he did little to eliminate the causes of his cardiac condition. Despite warnings to cease, he continued to smoke as much as 2 to 2½ packs of cigarettes per day. There is no evidence that he exercised, or reduced his

**362**

food intake as recommended by the medical staff. The record reveals that he was not taking the medicine prescribed for him. According to Dr. Barrett, there is a steady progression of coronary blockage in males beginning at age twenty (20), and, at age fifty (50), more than half have blockages of greater than fifty percent (50%). Furthermore, Dr. Barrett believed that plaintiff had significant blockage in 1994 when he refused to take the sestimibi test which, if administered, may have revealed plaintiff's actual cardiac condition. But, again, if he would not follow orders on ways to reduce the risk, the ultimate need for surgery would remain. The same observation can be made as to the potential benefit from the early use of a statin drug inasmuch as there is evidence that even when it was prescribed, plaintiff refused to take it.

Summing up, therefore, I accept the testimony of Dr. Barrett concerning the propriety and acceptability of the evaluation and treatment of plaintiff by the physicians and medical staff and conclude that plaintiff did not prove by a preponderance of the evidence that the treatment he received from the medical staff at all the federal institutions was below the acceptable standard of medical care. The Clerk of Court is directed to enter judgment in favor of defendant and to close the case.